# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **GREGORY C. JONES,** | ) | **CASE NO. 1:16CV2892** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **JUDGE JOHN R. ADAMS** |
| **v.** | ) | |
| | ) | **MAGISTRATE JUDGE** |
| **JAMES HAVILAND,** | ) | **JONATHAN D. GREENBERG** |
| **Warden** | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| **Respondent.** | ) | **(Doc. Nos. 1, 2, 9, 11, 12.)** |

This matter is before the undersigned pursuant to Local Rule 72.2.  Before the Court is the Petition of Gregory C. Jones ("Jones" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  Jones is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case of *State v. Jones*, Cuyahoga County Court of Common Pleas Case No. CR-13-570553-A.  For the following reasons, the undersigned recommends the Petition be DENIED.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695

F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The

state appellate court summarized the facts underlying Jones's conviction as follows:

> {¶ 6} Testimony at trial revealed that the victim, L.L., who was visiting the Cleveland area from Chicago, testified that she met Jones, who is a Cleveland police officer, while staying with a friend, Ebonyshia Terrance ("Ebony"), at approximately 9:30 p.m. on July 13, 2012. Ebony invited Jones to her home to play cards. Jones and L.L. "made small talk" for approximately 20 to 30 minutes while sitting on the living room couch. After learning that Jones did not wish to play cards, L.L. testified that she offered to walk Jones to his car, because there was "no need for him to be there."

> {¶ 7} L.L. testified that when they arrived at Jones's car, which was parked in Ebony's driveway, he asked her to sit in the car and she did. She stated that Jones offered to give her a tour of the city and she declined. He asked again, telling her that it would only take five minutes. L.L. agreed to go, but she told Jones that she needed to go back to the house to get her insulin pump and her cell phone. She has diabetes and is insulin dependent, requiring continual monitoring and adjusting of her blood sugar levels. He once again told her that they would only be gone for five minutes, so she agreed, leaving the house without her insulin pump, purse, or cell phone. L.L. testified that had she planned to be gone for a longer period of time, she would have attached her insulin pump, stating that she could not go very long without her pump.

> {¶8} L.L. testified that after driving around the neighborhood for approximately five or ten minutes, they pulled into Jones's driveway. L.L. testified that Jones told her he needed to get something inside his house and he invited her inside. She initially declined, but "he kept insisting it will only take a minute." L.L. stated that she "eventually agreed to go in because he wouldn't let up." She stated that she was not concerned or scared, because Jones was a friend of Ebony's and he was a police officer, and she "didn't think anything of it." In her previous employment as a 911 dispatcher in her hometown, she would often interact with police officers.

> {¶ 9} Once inside the house, Jones asked L.L. to have a seat; she sat on the couch, and he left the room for approximately five minutes. She stated that when he returned, Jones did not have any pants on and "his penis was out" and he was erect. He told her to "suck it." L.L. testified that she said "no." He then told her to "touch it," and he proceeded to grab her hand and place her hand on the tip of his penis. She stated that she immediately jumped back and removed her hand. She now began to worry, explaining that she did not know where she was, he had his pants down, and she was afraid that he was going "to do something that I didn't want to happen." L.L. stated that Jones indicated he wanted to "titty fuck" her and he then approached her, pulled her shirt *939 and bra down, and placed his penis between her exposed breasts, moving his penis up and down. L.L. asked him to stop and pushed him back. After she pushed him, Jones stopped.

2

{¶ 10} L.L. testified that she then jumped up, put her shirt and bra back in place, and asked that he take her back to Ebony's house. She informed Jones that she was menstruating, in hopes to dissuade him from wanting to have sex with her. She stated that she could not leave the room because he was standing between her and the door, blocking the exit. She was scared. He told her to calm down, and she backed away from him, toward the bed. According to L.L., "all of a sudden," he apologized, pushed her so that she fell back on the bed, sat on her, pulled her shirt back down, and began to "titty fuck" her again. She stated that she was having difficulty breathing and she tried to get out from under him by wiggling her shoulders; however, her arms were trapped under his legs and she was beginning to lose feeling in her arm. L.L. testified that Jones then flipped her over onto her stomach, which caused her right arm to be wedged under her chest, removed her shorts, and proceeded to have anal sex with her, despite her attempts to move and her "begging him to stop." She stated that she was in pain and was crying, and the more she asked him to stop, the more force he applied.

{¶ 11} L.L. testified that she has a medical condition in her right arm called "frozen shoulder," which resulted in limited mobility and use of her arm and very little strength. Dr. Joseph Thometz, an orthopedic surgeon who has treated L.L. for her shoulder condition, testified that L.L. had adhesive capsulitis. This condition causes progressive loss of motion, stiff and painful joints, and weakness. Dr. Thometz testified that, due to this condition and L.L.'s "very limited range of motion," L.L. would not have been able to push herself up while lying on her back, or to a limited degree but with pain, push herself up while lying on her stomach.

{¶ 12} L.L. stated that at the point where Jones began to apply more force, her right arm had gone completely numb "to where it [felt] like pins and needles were stabbing" her and she had difficulty moving it. She stated that after he had finished, she could not move her right side at all. And at one point, Jones also bit both sides of her neck as she attempted to remove herself from that position.

{¶ 13} After Jones had removed himself from being on top of L.L., she managed to roll herself onto her left side, sit up, dress, and exit Jones's house. She was in a lot of pain. She walked to the street, refusing Jones's offer to drive her. She testified that Jones followed her in his car, telling her to get in the car. She stated that he repeatedly apologized, stating that he did not mean to hurt her but "it's just been a while, and he couldn't help himself." She eventually found her way back to Ebony's house.

{¶ 14} Upon arriving at Ebony's house, L.L. "broke down and cried." She then went into the house, retrieved her cell phone, and proceeded back outside. She called her daughter's father, Joseph Tolliver, and told him she had been raped. Tolliver testified that he was working when he received a call from L.L. at approximately 11:30 p.m. He stated that she was crying and distraught and she was having difficulty answering

3

some of his questions, because "she was still trying to get herself together." L.L. refused to call the police because she knew that Jones was a police officer in the district where the rape had occurred. Tolliver told L.L. that he would call his pastor, who is a detective with the Cleveland Police Department, for advice. *940 He told L.L. to tell Ebony what happened and to go to the hospital. He then arranged for friends to pick her up and take her to the hospital.

{¶ 15} L.L. then called Ebony from her cell phone and asked her to come outside, where she proceeded to tell Ebony what happened. Ebony advised L.L. to go to the hospital, and she forwarded a picture of Jones to L.L.'s phone for the hospital's use of a description of Jones. L.L. testified that at this point, she was beginning to feel very sick, her heart was beating very fast, she was having some chest pain, and her mouth was hurting badly. L.L. had previously had some teeth extracted and was in need of future dental work.

{¶ 16} Tolliver's friends, Lovasia Clemente and Dawon Campbell, arrived at Ebony's house to pick up L.L. and take her to the hospital. Clemente testified that L.L. looked upset, was crying and shaking, and she did not "look like herself." She stated that L.L. was "not together at all" and she appeared to be in a lot of pain. Campbell testified that L.L. "looked like crap," explaining that she looked like she had been in a fight. He stated that L.L. "was all roughed up looking. She didn't look the same. She was crying."

{¶ 17} L.L. retrieved her insulin pump and checked her blood sugar level, which was at a dangerous level. L.L. entered the blood sugar reading, and the pump immediately began to give her insulin. She also began to get feeling back in her shoulder. Clemente and Campbell drove L.L. to the hospital. After explaining to hospital personnel that she had been raped by a police officer, they directed her to a different hospital so that she may be examined by a qualified nurse. Before leaving, however, the nurses gave L.L. pain medication. L.L. testified that her mouth was hurting because, when Jones was lying on top of her, he was pressing her face down on the bed. She stated that the medication alleviated some of the mouth and shoulder pain; however, she was still experiencing pain in her rectal area.

{¶ 18} Tolliver arrived and drove L.L. to Hillcrest Hospital, where L.L. was examined by Mary Andrykovitch, a sexual assault nurse examiner ("SANE"), at approximately 4:00 a.m. Andrykovitch testified that she specifically remembered L.L.'s mouth was swollen and she was in a lot of pain, having recently had mouth surgery. She also noted that she was concerned about L.L.'s blood sugar level, which was "through the roof," at a potentially fatal level. She stated that L.L.'s clothes were disheveled, she was crying and shaking, and she appeared visibly upset. Andrykovitch testified that L.L. had red marks on her neck that were consistent with bite marks, bruising on her right shoulder that was consistent with "being held down," and trauma to her rectal area.

4

{¶ 19} A couple of days later, when L.L. learned that Tolliver's pastor would not be available to assist her in filing a police report, she reported the rape to the second district police department.

{¶ 20} Gregory Jones testified on his own behalf. According to Jones, he knew that L.L. was attracted to him immediately upon entering Ebony's living room. L.L. followed him to his car as he was leaving Ebony's house. He testified that, after some "small talk" on the porch, they both got into his car, where L.L. put her hand on his inner thigh, and he reciprocated. They "were doing a little more rubbing than talking" and he suggested they go to his house. She agreed. Jones stated that they were "just going at it * * * we were just all over one another." He then invited her into the house where they "continued to go at it." At one point, he expressed his desire to have anal sex. According to Jones, L.L. turned over, helped *941 get her shorts off, and positioned herself on her stomach while tilting her bottom up. He stated that L.L. then "put my penis on her anus" and they proceeded to have consensual anal sex. He stated that when he had finished, L.L. was crying.

{¶ 21} Upon cross-examination, Jones was unable to estimate how much time had passed between acts, stating only "a while" or "quite a while." He also testified on cross-examination that he did not pay any attention to L.L.'s face or the position of her arms. He could not testify as to which hand L.L. used to reach through her legs in order to reach his penis, nor could he explain how L.L. was able to support herself on her weak shoulder while doing this. Jones testified, however, that L.L. initiated anal sex, by placing his penis on her anus, without asking for lubrication. He stated that L.L. did not tell him to stop.

*State v. Jones*, 35 N.E.3d 934, 938-941 (Ohio App. 8th Dist. 2015).

## II. Procedural History

### A.    Trial Court Proceedings

In January 2013, a Cuyahoga County Grand Jury charged Jones with (1) one count of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(4) with 1 and 3 year firearm specifications, a sexual motivation specification, and a sexually violent predator specification (Count One); (2) three counts of rape in violation of Ohio Rev. Code § 2907.02(A)(2) each with 1 and 3 year firearm specifications and a sexually violent predator specification (Counts Two, Three, and Four); (3) one count of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(4)

5

with sexual motivation and sexually violent predator specifications (Count Five); (4) one count of rape in violation of Ohio Rev. Code § 2907.02(A)(2) with a sexually violent predator specification (Count Six); and (5) three counts of gross sexual imposition in violation of Ohio Rev. Code § 2907.05(A)(1) each with sexually violent predator specifications.  (Doc. No. 9-1, Exh. 1.)  The first four counts alleged conduct in June 2008 towards Jane Doe 1, while the remaining counts alleged conduct on or about July 13, 2012 towards Jane Doe 2.  (*Id*.)  It is undisputed that "Jane Doe 2" refers to L.L.  Jones pled not guilty.  (Doc. No. 9-1, Exh. 2.)

On November 13, 2013, the State filed a "Motion in Limine to Preclude Mention of Victim's Previously Dismissed Misdemeanor Criminal Case."  (Doc. No. 9-1, Exh. 3.)  Therein, the State explained that "in July 2009, victim Jane Doe II [i.e., L.L.] * * * was charged with the misdemeanor offense of Disorderly Conduct under Chapter 720 Illinois Compiled Statutes, Act 5, SubSection 26-1(a)(11)."  (*Id*.)  The State indicated the charge was ultimately dismissed and argued L.L. had, therefore, "not been convicted of any qualifying offenses for impeachment purposes" under Ohio Evidence Rule 609.  (*Id*.)  The State requested the trial court order Jones "to refrain from attempting to impeach [L.L.] during cross examination by mention of the above-mentioned dismissed misdemeanor prosecution."  (*Id*.)

Jones filed a brief in opposition several days later.  (Doc. No. 9-1, Exh. 4.)  He argued as follows:

> 3.  The defense recognizes that impeachment of a prior conviction must be in accordance with the requirements of Evidence Rule 609 and that a dismissal does not meet the evidentiary requirements of the rule.
>
> 4.  The defense instead relies on the authority of Evidence Rule 608(B) which permits cross-examination relative to specific instances of conduct concerning a witness's character for untruthfulness.  In this case the evidence is irrefutable that in 2009 State's witness, [L.L., i.e., Jane Doe II], filed a false police report with the

6

Matteson Police Department wherein she claimed to have been the subject of an armed robbery. Her version of what occurred was detailed and elaborate and included her manipulating her five-year-old child to convince the authorities of her claim. The defense attaches hereto a copy of the investigative summary of this incident and incorporates it as if fully rewritten. It is the position of the defense that this is precisely the type of specific instance of conduct that is contemplated by Evidence Rule 608. This wild fabrication by [L.L.] demonstrates that [L.L.] is the kind of person that will lie and manipulate, and cause others to lie and manipulate, even as it relates to providing false information to law enforcement authorities. At a minimum, the jury in this case should be entitled to consider whether this detailed fabrication impacts on her credibility. At no time will the defense ask [L.L.] whether she was charged or convicted of any offense under lllinois law.

(Doc. No. 9-1, Exh. 4 at Page ID#117-118.) Jones further argued "to prohibit the defense from inquiring on this specific factual circumstance which illustrates lying and manipulating others would severely prejudice [him]." (*Id.*)

The State thereafter filed a Reply. (Doc. No. 9-1, Exh. 5.) The State asserted L.L. had, in fact, been robbed but that "when asked how much money was stolen, [L.L.] exaggerated the amount because she was short on rent money." (*Id.*) The State emphasized L.L. "confessed" to filing a false police report six days after the incident.[1] (*Id.*) In light of these circumstances, the State argued "there is no 'high degree of probative value' in inquiring into [L.L.'s] 2009 statements to police." (*Id.*)

---

[1] In a Voluntary Statement submitted to the police, L.L. stated: "I did not tell Sgt. Jones or Ofc. Johnson the whole truth. I have a gambling problem. I have had a gambling problem for over ten years (off and on). When I was 21 years old, I received an inheritance of over $80,000 and I gambled most of that away. On Friday, July 3rd, I went to the Ameristar Casino in Gary, Indiana where I lost the $500 which I had from my daughter's disability check that I had set aside for rent. I then went to the ATM and took out another $460 which I also gambled away. I was hoping to win the money back so that I can pay my bills. I did not want to tell my mother that I lost the rent money from gambling, so I used this opportunity to say that I was robbed. * * * I am very sorry to make Ofc Johnson, Sgt. Jones and everyone from the Matteson Police Department waste their time when I know they are busy. I promise that this will not happen again. * * * I am sorry." (Doc. No. 9-1, Exh. 4 at PageID#131.)

Jury trial initially commenced on November 18, 2013.  Several days later, however, Jones requested a continuance to review additional witness discovery.  *See* Docket for *State v. Jones*, Cuyahoga County Court of Common Pleas Case No. CR-13-570553-A.

Jury trial commenced again on March 17, 2014.  (Doc. No. 9-2 at Tr. 33.)  The following day, the trial court granted the State's Motion in Limine, explaining as follows:

> I did have an opportunity yesterday to make a more in-depth reading on the State's motion in limine, and concerning the 608(b) specific instances of conduct, and I guess as it concerns [L.L.], and what transpired in I think Illinois.
>
> But in any event, taking a review of the statute, as well as the case law, the case law suggests and the State also indicates there is a four-prong test that must be reviewed, number one, if it is clearly probative of untruthful character; secondly, if it is introduced at cross; third, if there is a good-faith basis to make inquiry; four, subject to 404(b) standards.
>
> And I do note this instant case as it pertains to [L.L.], date of, at least as indicted, is July of 2013.  The prior event happened in July of 2009.  Six days later she came in on her own volition and voluntarily indicated to the police that she was not truthful in her initial report, lying about losing some money, because she didn't want to face her debt.
>
> So I don't think that that is clearly probative of untruthful character, so I'm going to grant the State's motion in limine on that issue.

(Doc. No. 9-2 at Tr. 58-59.)  Jones' counsel strongly objected, arguing "this is probably the most critical topic of cross-examination for this accuser.  It strikes to the very heart of her credibility, her propensity for truthfulness, her ability to fabricate."  (*Id*. at Tr. 60.)  The trial court stood by its ruling.  (*Id*. at Tr. 61.)

Later in the trial, the defense indicated it intended to call Jones to testify in his own defense.  (Doc. No. 9-11 at Tr. 1891.)  Defense counsel asked the trial court to prohibit the State from questioning Jones "regarding the fact that he has a sexually transmitted disease ["STD"] and he may or may not have had unprotected sex with one or more women during the time

8

period he had that STD." (*Id*. at 1891-1892.)  The State argued this line of questioning was

relevant both to the issue of Jones' truthfulness and to the issue of consent.  (*Id*. at Tr. 1892-

1893, 1898-1899.)  The Court denied Jones' request to prohibit cross-examination on this issue,

explaining as follows:

> I'm going to try to make as clear a record as possible.  As I'm envisioning the
> scenario if Mr. Jones takes the stand, as someone just indicated, [and testifies] this
> is a consensual encounter, seems to me the logical questioning on cross-examination
> might be, well, if you had mentioned to her that you had an STD, would either that
> still be consensual, or would you have utilized a use of birth control, in this case,
> condom, I suppose.
>
> And again, I'm not suggesting that's exactly how the testimony would be developed
> over the questioning.  But that seemed to be a logical and relevant line of questioning
> that would come into my mind.
>
> So for that reason, as well as what the State indicated otherwise, I'm going to allow
> that testimony to come in.
>
> * * *
>
> And, so, I'll – I would say this goes directly towards that issue, of consent.  In that
> fashion, that line of questioning, again, if, there had been that disclosure, would
> consent have been given.
>
> At least now there is a logical argument that could be made to say, well, you know,
> consent would have been given, and there is – so therefore, it was asked.  You
> weren't told about it, then the force aspect to me kind of flows all through there.

(Doc. No. 9-11 at Tr. 1899-1901.)  Defense counsel strenuously objected, arguing "if [L.L.'s]

false statements to the police in Chicago, and later her written confession that she lied to the

police, is not probative of truthfulness, how in the world could [Jones'] failure to disclose [the

fact he has an STD], when he doesn't have an obligation to disclose it, rise to the level of

untruthfulness?" (*Id*. at Tr. 1902-1903.)  After hearing additional argument, the trial court

declined to change its ruling, finding "I do not think that it's inflammatory, prejudicial in nature,

9

outweighs its probative value." (*Id*. at Tr. 1906.)

On April 2, 2014, the jury found Jones guilty of kidnapping with sexual motivation specification as set forth in Count Five of the indictment; and rape with under Count Six of the indictment.  (Doc. No. 9-1, Exh. 7.)  Jones was found not guilty of all the remaining charges, including the three gross sexual imposition charges relating to L.L.  (*Id*.)

The trial court conducted a sentencing hearing on May 16, 2014, at which time it found Counts Five and Six to be allied offenses and merged them for purposes of sentencing.  (Doc. No. 9-1, Exh. 8.)  The State elected to proceed on Count Six (rape).  (*Id*.)  Jones was sentenced to nine (9) years imprisonment and five (5) years of mandatory post-release control.  (*Id*.)

**B.**     **Direct Appeal**

On June 12, 2014, Jones, through new counsel, filed a Notice of Appeal with the Court of Appeals for the Eighth Appellate District ("state appellate court").  (Doc. No. 9-1, Exh. 9.)  In his appellate brief, Jones raised the following assignments of error:

>  I.     The trial court committed prejudicial error and denied appellant his rights to confront his accuser, to present a defense, and to a fair trial when it prevented him from cross examining his accuser regarding a false police report she filed in Matteson, Illinois in 2009.
>
>  II.    The trial court committed error when it permitted the state to question Mr. Jones about his having herpes as the question was unduly prejudicial and immaterial.
>
>  III.   The court should have dismissed counts two through nine of the indictment because the indictment did not properly charge venue on those counts.

(Doc. No. 9-1, Exh. 10.)  The State filed a brief in response.  (Doc. No. 9-1, Exh. 11.)

On June 4, 2015, the state appellate court affirmed Jones's convictions and prison sentences.  (Doc. No. 9-1, Exh. 12.)  *See also State v. Jones*, 35 N.E.3d 934 (Ohio App. 8th Dist.

10

2015).  The appellate court first found the trial court erred in finding the evidence of L.L.'s false

police report was not clearly probative of L.L.'s character for truthfulness or untruthfulness.

*Jones*, 35 N.E.3d at 945.  It further concluded the trial court erred in allowing the State to

question Jones regarding the fact that he failed to disclose to L.L. that he had a STD.  *Id*. at 947-

948.  The appellate court determined, however, that the trial court's errors were harmless in light

of the "overwhelming evidence" of Jones' guilt.  *Id*. at 948-949.[2]

One judge of the three judge panel dissented, finding "given that the two evidentiary

errors dealt directly with issues of veracity and credibility, and in particular, because the jury

acquitted Jones on the three counts of gross sexual imposition, it cannot be said that these errors

were harmless beyond a reasonable doubt."  *Id*. at 949.

On July 16, 2015, Jones, through counsel, filed a Notice of Appeal with the Supreme

Court of Ohio.  (Doc. No. 9-1, Exh. 13.)  In his Memorandum in Support of Jurisdiction, Jones

raised the following Proposition of Law:

> I.      The trial court committed error when it prevented Appellant from cross-
> examining his accuser regarding events which lead to a charge of
> falsifying a police report, and when it permitted the State to question
> Appellant regarding the fact that he had, and his failure to disclose that he
> had herpes, and those errors were not harmless.

(Doc. No. 9-1, Exh. 14.)  The State filed a response on August 17, 2015.  (Doc. No. 9-1, Exh.

15.)

On December 16, 2015, the Supreme Court of Ohio declined to accept jurisdiction of the

appeal pursuant to S.Ct. Prac. R. 7.08(B)(4).  (Doc. No. 9-1, Exh. 16.)

**C.      Federal Habeas Petition**

---

[2] The appellate court rejected Jones' argument regarding venue. *Id*. at 941-942.

On November 30, 2016, Jones, through counsel, filed a Petition for Writ of Habeas Corpus (Doc. No. 1) and Memorandum of Law in Support of his Petition (Doc. No. 2) in this Court.  Therein, Jones asserted the following grounds for relief:

**GROUND ONE**:  The Trial Court Violated Mr. Jones' Sixth Amendment Right to Confrontation and Right to Present a Defense by Preventing Him from Cross-Examining His Accuser About Her Prior False Police Report.

**Supporting Facts**: The Confrontation Clause of the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  According to the United States Supreme Court, "the central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  *Maryland v. Craig*, 497 U.S. 836, 845, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990).  Mr. Jones' constitutional right to confrontation as guaranteed by the Sixth Amendment was violated when the trial court prohibited him from cross-examining his accuser about a prior false police report she filed in 2009. Counsel for Mr. Jones explained that he sought to confront the woman about this specific instance of conduct because it related to her character for truthfulness, which was a central issue in the credibility battle between Mr. Jones and the woman.

A federal habeas court evaluates a state court's characterization of a constitutional trial error as harmless under the standard set forth in *Brecht v. Abrahamson*, which is whether the error had a substantial and injurious effect or influence in determining the jury's verdict. 507 U.S. 619, 623 (1993). Here, the jury acquitted Mr. Jones of seven of the nine counts set forth in his indictment. Without question, the overall strength of the State of Ohio's case was weak. For reasons to be elaborated upon in the Memorandum of Law, the trial court's ruling was not harmless error, but rather deprived Mr. Jones of his constitutional rights and had a substantial and injurious effect on the proceedings.

**GROUND TWO**: The Trial Court Deprived Mr. Jones of his Fourteenth Amendment Right to Due Process of Law by Admitting Irrelevant and Prejudicial Character Evidence about Mr. Jones.

**Supporting Facts**: While evidentiary questions generally do not

12

rise to a constitutional level, where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007). In the case at bar, the trial court deprived Mr. Jones of due process of law and his right to a fair trial by allowing the State of Ohio to examine Mr. Jones about whether he disclosed to his accuser that he had a sexually transmitted disease. Ruling that evidence of Mr. Jones' sexually transmitted disease was admissible, the trial court held that there was at least a fair inference that his accuser could not have consented to sexual activity with Mr. Jones had she known of his disease. In reality, the questioning of Mr. Jones about his sexually transmitted disease was not used to show untruthfulness or that his sexual encounter was not consensual. The line of questioning was designed to impress on the jury negative inferences about Mr. Jones and his character. The evidentiary error in permitting the State of Ohio to introduce evidence about Mr. Jones' sexually transmitted disease was so egregious that it resulted in a denial of Mr. Jones' right to due process of law.

(Doc. 2-2.)

On March 21, 2017, Warden James Haviland ("Respondent") filed his Return of Writ.

(Doc. No. 9.)  Jones filed a Traverse on May 22, 2017.  (Doc. No. 11.)  Respondent thereafter

filed a sur-reply on May 26, 2017.  (Doc. No. 12.)

### III.  Review on the Merits

**A.      Legal Standard**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

13

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012).  *See also Lopez v. Smith*, ––– U.S. –––, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state

14

court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*.  *See also Shimel*, 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly."  *Williams v. Taylor,* 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions."  *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id*. at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal."  *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 786–87.  This is a very high standard, which

15

the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

### 1.      Ground One

In his first ground for relief, Jones argues his constitutional rights to confrontation and to present a complete defense were violated when the trial court prohibited him from cross-examining L.L. about her prior false police report.  (Doc. No. 2 at 6, 7.)

On direct appeal, the state appellate court found the trial court had, indeed, erred in this prohibiting the defense from cross-examining L.L. on this issue, as follows:

{¶ 30} In his first assignment of error, Jones contends that the trial court erred when it prevented him from cross-examining L.L. regarding a false police report L.L. had filed in Illinois in 2009.  The trial court determined that this evidence was not "clearly probative" of untruthfulness and granted the state's motion to prohibit Jones's cross-examination on this issue.

{¶ 31} In response to the state's motion in limine, Jones attached a copy of an incident report from the Matteson, Illinois Police Department that is dated July 4, 2009, and identifies L.L. as the victim of an aggravated robbery.  The report also includes a supplemental report dated July 6, July 9, and July 10.

{¶ 32} According to L.L., as indicated in the police report, she was robbed by two purportedly armed men of $850 on July 4.  On July 6, L.L. provided additional detail regarding the alleged robbery through a supplemental report. On July 9, police officers summarized their investigation in another supplemental report. Finally, on July 10, the supplemental report indicated that "[a]fter debating the facts of the case," L.L. informed the investigating officer that the "real truth" was that she was, in fact, robbed; however, "they did not get anything because she already lost the money" gambling. L.L. explained that she fabricated the story because she did not want to get into trouble with her mother for losing the rent money.  L.L. was then charged with one count of misdemeanor disorderly conduct for filing a false police report, which was later dismissed.

{¶ 33} In his brief in opposition to the state's motion and again on appeal, Jones stated that he did not intend to inquire on cross-examination of the nature of the dismissed charge; rather, he claimed that he was entitled to cross-examine L.L., under Evid.R. 608(B), on the false police report, for the limited purpose of attacking her character for truthfulness.  The state argued that the 2009 false police report does

16

not exhibit a high degree of probative value as to L.L.'s truthfulness and the trial court was within its discretion to preclude the defense from cross-examining the witness on the report.

{¶ 34} Under Evid.R. 402, only relevant evidence is admissible. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Although relevant, evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403. Unfair prejudice is "that quality of evidence which might result in an improper basis for a jury decision." *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 24.

{¶ 35} Evidence of a person's character is not admissible for the purpose of proving that the individual "acted in conformity therewith on a particular occasion," with certain exceptions:

> (1) Character of accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

> (2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

> (3) Character of witness. Evidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609.

Evid.R. 404(A).

{¶ 36} The exception relevant to our discussion of Jones's first assignment of error is the evidence of the character of a witness as outlined in Evid.R. 608(B). That rule provides as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than

17

conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Evid.R. 608(B).

{¶ 37} Evid.R. 608(B) is a rule of law that " 'protects a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime with which the defendant was charged.' " *State v. Myricks*, 2d Dist. Montgomery No. 22846, 2009-Ohio-5304, 2009 WL 3183120, ¶ 26, quoting *State v. Boggs*, 63 Ohio St.3d 418, 422–23, 588 N.E.2d 813 (1992). In balancing this state interest, a defendant may question a witness on cross-examination regarding prior instances of misconduct when the questioning is "clearly probative" of the witness's character for truthfulness. *State v. Moshos*, 12th Dist. Clinton No. CA2009–06–008, 2010-Ohio-735, 2010 WL 703242, ¶ 18; *see also State v. Widmer*, 12th Dist. Warren No. CA2011–03–027, 2012-Ohio-4342, 2012 WL 4350275, ¶ 134.

{¶ 38} Therefore, Evid.R. 608(B) permits cross-examination of a witness regarding specific instances of conduct that may have "a clear bearing" upon the witness's truthful character and requires a "high degree of probative value" of the prior conduct "as to the truthfulness of the witness" before the court will allow cross-examination as to the prior conduct for purposes of attacking the credibility of the witness.  Staff Notes to Evid.R. 608(B).  The conduct must therefore be "clearly probative of truthfulness or untruthfulness" in order to avoid unfair prejudice, confusion of the issues, and misleading of the jury. [footnote omitted] *Widmer*, citing *State v. Williams*, 1 Ohio App.3d 156, 157, 440 N.E.2d 65 (10th Dist.1981).

{¶ 39} "Probative" evidence is evidence that is relevant and "tends to prove the issue in question."  *Our Place, Inc. v. Ohio Liquor Control Comm*., 63 Ohio St.3d 570, 571, 589 N.E.2d 1303 (1992) (defining "probative" in the context of an administrative agency's standard of review); *see also Ross v. Cleveland Unit*, 8th Dist. Cuyahoga  No. 48322, 1985 WL 9757, *2 (Mar. 7, 1985) (applying the ordinary dictionary meaning as having the effect of proof or tending to prove).

{¶ 40} The general admission or exclusion of evidence rests in the sound discretion of the trial court, and a trial court's ruling on the admissibility of evidence will be upheld absent an abuse of discretion and a showing of material prejudice.  *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, 2015 WL 1249680, ¶ 139.  Within this broad discretion is the trial court's duty "to determine whether testimony is relevant and to balance its potential probative value against the

danger of unfair prejudice." *State v. Clark*, 8th Dist. Cuyahoga No. 95928, 2011-Ohio-4109, 2011 WL 3630484, ¶ 32. The trial court's discretion is therefore subject to the provisions of Evid.R. 403.  *Ruff v. Bowden*, 10th Dist. Franklin No. 94APE08–1116, 1995 WL 141045, *3 (Mar. 28, 1995).

{¶ 41} A trial court abuses its discretion where its ruling lacks a " 'sound reasoning process.' " *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 42} In support of its argument that the trial court properly excluded evidence of L.L.'s false police report, the state cites to *Williams*, 1 Ohio App.3d 156, 440 N.E.2d 65.  In *Williams*, the court held that the trial court did not abuse its discretion in excluding defense counsel's line of questioning concerning a previous employment application falsified by the state's key witness in a matter involving an alleged aggravated burglary. The court determined that information about the witness's falsified job application concerned an event that occurred four years earlier and the defense was otherwise permitted wide latitude in questioning the witness. *Id*.

{¶ 43} The state also cites to *State v. Lenoir*, 2d Dist. Montgomery No. 19241, 2003-Ohio-2820, 2003 WL 21267227.  In *Lenoir*, the court affirmed the trial court's decision to prohibit the defendant from questioning the witness concerning her failure to file income taxes, her previous use of drugs, and whether she carried a gun. The court determined that these matters were extrinsic to the defendant's charges of abduction and assault and therefore not clearly probative of truthfulness. *Id*. at ¶ 31.

{¶ 44} Where prior misconduct is not relevant to the underlying action and would lead to a "distracting inquiry into entirely unrelated matters," as seemingly indicated above, it is appropriate to exclude such evidence. *See State v. Harrison,* 8th Dist. Cuyahoga No. 69821, 1996 WL 476464, *6 (Aug. 22, 1996).  However, where the victim's credibility is the crucial issue and his or her testimony is vital to the state's case, a trial court abuses its discretion when it "unduly limits cross examination of the victim." *State v. Carlson*, 31 Ohio App.3d 72, 73, 508 N.E.2d 999 (8th Dist.1986) (allowing evidence of prior misconduct under Evid.R. 608(B) where the victim and the defendant were the only witnesses to the crime and their stories differed), citing *State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983). In cases where evidence of specific instances of conduct is permitted, the central focus is the witness's behavior, not the mere existence of the prior misconduct. *See Myricks*, 2d Dist. Montgomery No. 22846, 2009-Ohio-5304, 2009 WL 3183120, at ¶ 28 (finding the evidence of prior misconduct inadmissible where the defendant only sought to rely on the fact of the prior misconduct rather than the witness's behavior as it relates to the witness's character for truthfulness).

**{¶ 45} Here, we find that the false police report filed by L.L. exhibits a high**

19

**degree of probative value of L.L.'s truthfulness.  In this case, the crucial issue is L.L.'s credibility.  L.L. and Jones were the only witnesses to the incident that gave rise to Jones's conviction for rape and kidnapping, and they had dramatically different versions of the event.  The state's case rests on whether L.L. told the truth when she reported to police that the sexual encounter with Jones was not consensual and that she was raped.  L.L.'s testimony is the material evidence establishing Jones's guilt.  Evidence that she previously provided false information to the police regarding allegations of criminal conduct committed against her could cast doubt on her credibility. This evidence is therefore relevant and highly probative.**

{¶ 46} Moreover, the trial court's reasoning for prohibiting the evidence is unsustainable. In granting the state's motion in limine, the court stated that "[s]ix days [after the alleged event of 2009, L.L.] came in on her own volition and voluntarily indicated to the police that she was not truthful in her initial report * * *. So I don't think that that is clearly probative of untruthful character * * *." According to the trial court, because L.L. recanted her initial false report, she cured any concerns about her credibility.  We disagree.  **L.L.'s recantation does not diminish the probative nature of the fact that she filed false allegations in the first place.**

{¶ 47} We therefore find the trial court erred in finding the evidence of L.L.'s false police report was not clearly probative of L.L.'s character for truthfulness or untruthfulness.

*Jones,* 35 N.E.3d at 942-945 (emphasis added).  As discussed at greater length *infra*, the state

appellate court then found the trial court further erred in permitting the State to cross-examine

Jones regarding whether he disclosed having herpes to L.L.  *Id.* at 945-946.

The state appellate court then conducted a harmless error analysis, finding as follows:

{¶ 57} Having found errors in the admission (and exclusion) of evidence, we must now determine whether the errors are reversible or harmless. For the reasons set forth below, we find that reversal is not required, as we find the errors to be harmless.

{¶ 58} An error is harmless if it does not affect a substantial right of an accused Crim.R. 52(A); *State v. Mims*, 8th Dist. Cuyahoga No. 100520, 2014-Ohio-5338, 2014 WL 6807252, ¶ 60.  The accused, therefore, has a constitutional guarantee to a trial free from prejudicial error, not necessarily one free of all error.  *State v. Fears*, 8th Dist. Cuyahoga No. 89989, 2008-Ohio-2661, 2008 WL 2257751, ¶ 14.  And where there is no reasonable possibility that the unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal.  *Id.*,

20

citing *State v. Lytle,* 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), paragraph three of the syllabus, vacated on other grounds in *Lytle v. Ohio*, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978).

{¶ 59} In finding harmless error, the appellate court must review the entire record, excise the objectionable evidence, and find that there is overwhelming evidence of the defendant's guilt, aside from the objectionable material.  *State v. Davis*, 44 Ohio App.2d 335, 338 N.E.2d 793 (8th Dist.1974), paragraph three of the syllabus. "An otherwise valid conviction should not be set aside if the reviewing court may confidently say, in the whole record, that the error was harmless beyond a reasonable doubt." *State v. Matthews*, 8th Dist. Cuyahoga No. 59467, 1991 WL 263742, *4 (Dec. 12, 1991). Therefore, the conviction should not be reversed where the remaining evidence, standing alone, constitutes overwhelming evidence of defendant's guilt. *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), paragraph six of the syllabus.

**{¶ 60} Notwithstanding the errors in this case, we find there is overwhelming evidence of Jones's guilt.  L.L. testified that she did not consent to anal sex with Jones, stating that she begged him to stop.  She reported the incident to her daughter's father and to her friend with whom she was staying almost immediately upon getting away from Jones.  Several witnesses testified that she appeared visibly shaken, was crying and in pain, and she was physically disheveled.  Having presented herself to two hospitals for examination, she was ultimately referred to a qualified SANE nurse.  The SANE nurse testified that L.L. was in a lot of pain, her mouth was swollen, and her blood sugar level was at a potentially fatal level.  The nurse also testified that L.L. had red marks on her neck that were consistent with bite marks, bruising on her right shoulder that was consistent with "being held down," and trauma to her rectal area.  Dr. Thometz testified that due to L.L.'s adhesive capsulitis, she experienced pain, weakness, and very limited range of motion of her right shoulder and she would not have been able to position herself in the manner to which Jones testified.  Within days, L.L. reported to the police that she had been raped.**

{¶ 61} In light of the overwhelming evidence above, we cannot say the trial court's errors improperly contributed to Jones's conviction.  **We therefore find the errors were harmless beyond a reasonable doubt and they did not deprive Jones of a fair trial**.

*Id.* at 948 (emphasis added).

Applying the standards set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710,

123 L.Ed.2d 353 (1993) and *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d

674 (1986), Jones argues "the omission of the evidence and inability to cross-examine L.L. on [her prior false police report] had a substantial and injurious effect on the jury's guilty verdict in connection with two of the nine counts against Mr. Jones."  (Doc. No. 2 at 11.)  In this regard, Jones emphasizes his "trial involved a high stakes credibility contest between L.L. and Mr. Jones."  (Doc. No. 11 at 1.)  He notes L.L. was the "only person present when the alleged crimes occurred" and asserts "no independent evidence – eye witness or otherwise – in the record would have allowed a jury to find beyond a reasonable doubt that Mr. Jones engaged in sexual conduct with L.L. against her will."  (Doc. No. 2 at 11.)  Jones argues "the strength of the State of Ohio's case was dubious, and had the jury learned about L.L.'s character for truthfulness and possible motivation for testifying, the jury may have acquitted Mr. Jones of all of the criminal conduct alleged by L.L."  (*Id*. at 15.)

Respondent argues the state appellate court's harmless error analysis is entitled to AEDPA deference.  (Doc. No. 9 at 19.)  He asserts the court's finding "there was overwhelming evidence of Jones' guilt is not objectively unreasonable," noting "the victim testified that the sexual encounter was not consensual, she reported the incident promptly, several witnesses testified that the victim was visibly shaken and crying and in pain and physically disheveled, with bruise marks and trauma on her neck consistent with bite marks along with other trauma to the victim's rectum."  (*Id*. at 19-20.)  In addition, Respondent maintains defense counsel was "allowed considerable latitude on cross-examination to delve into the victim's entire personal history and prior statements in an attempt to come up with a coherent factual theory of defense to demonstrate a motive on the part of the victim to lie about being raped by Jones after a brief acquaintance measured in minutes."  (*Id*. at 25.)  Respondent asserts "there is no conceivable

basis for concluding in light of the entire trial that the prior misdemeanor several years before

trial in an unrelated matter that the victim herself resolved to her credit could possibly have had a

substantial and injurious effect or influence in determining the jury's verdict as required by

*Brecht*."  (*Id*. at 26.)

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused,

applicable to the States by way of the Fourteenth Amendment, "to be confronted with the

witnesses against him."  U.S. Const. Amend. VI.  As the United States Supreme Court has

explained, "the right of confrontation 'means more than being allowed to confront the witness

physically.'"  *Van Arsdall*, 475 U.S. at 678 (quoting *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct.

1105, 39 L.Ed.2d 347 (1974)).  *See also Blackston v. Rapelje*, 780 F.3d 340, 349 (6th Cir. 2015).

Rather, " '[t]he main and essential purpose of confrontation is to secure for the opponent the

opportunity of cross-examination.' " *Id*. at 315–316 (quoting 5 J. Wigmore, Evidence § 1395, p.

123 (3d ed. 1940)) (emphasis in original).  "In general, challenges to the credibility of witnesses

will occur through cross-examination because 'cross-examination is the principal means by

which the believability of a witness and the truth of his testimony are tested.'" *Blackston*, 780

F.3d at 349 (quoting *Davis*, 415 U.S. at 316).

However, the Confrontation Clause does not preclude a trial judge from placing limits on

cross-examination.  *See Van Arsdall*, 475 U.S. at 679 ("It does not follow, of course, that the

Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits

on defense counsel's inquiry into the potential bias of a prosecution witness.").  *See also Weissert*

*v. Palmer*, 699 Fed. Appx. 534, 539 (6th Cir. Aug. 15, 2017); *Gerald v. Warden, Ross*

*Correctional Inst*., 2017 WL 2303672 at * 21 (S.D. Ohio Feb. 27, 2017).  "On the contrary, trial

23

judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.  Indeed, as the Supreme Court has explained, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam ) (emphasis in original).  *See also Van Arsdall*, 475 U.S. at 679.

A violation of the Confrontation Clause does not warrant automatic reversal but, rather is subject to harmless-error analysis.  *See Van Arsdall*, 475 U.S. at 681-682; *Blackston*, 780 F.3d at 359; *McCarley v. Kelly*, 801 F.3d 652, 665 (6th Cir. 2015).  The Supreme Court recently explained the contours of harmless error analysis, as follows:

> The test for whether a federal constitutional error was harmless depends on the procedural posture of the case.  On direct appeal, the harmlessness standard is the one prescribed in *Chapman [v. California*], 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 [1967]:  "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id*., at 24, 87 S.Ct. 824.

> In a collateral proceeding, the test is different.  For reasons of finality, comity, and federalism, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Brecht [v. Abrahamson*], 507 U.S. [619], 637, 113 S.Ct. 1710 [1993] (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)).  Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.' " *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).  There must be more than a "reasonable possibility" that the error was harmful. *Brecht, supra*, at 637, 113 S.Ct. 1710 (internal quotation marks omitted).  The *Brecht* standard reflects the view that a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually

prejudiced by the error."  *Calderon v. Coleman*, 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998) (per curiam ).

*Davis v. Ayala*, – U.S. –, 135 S.Ct. 2187, 2198, 192 L.Ed.2d 323 (2015).  *See also Blackston*, 780 F.3d at 359 ("In the context of federal habeas corpus, a constitutional error will warrant relief only if the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'"); *McCarley,* 801 F.3d at 665 ("*Brecht* requires a Confrontation Clause violation to have a 'substantial and injurious effect or influence in determining the jury's verdict' before it merits reversal on collateral review.").

Where, as here, a federal habeas petitioner challenges a state court's harmless error analysis, "he must meet the *Brecht* standard."  *Ayala,* 135 S.Ct. at 2198.  This does not mean, however, "that a state court's harmlessness determination has no significance under *Brecht*."  *Id*. Rather, the Supreme Court has found "the *Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*."  *Id*. (quoting *Fry v. Pliler*, 551 U.S. 112, 120, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007)).  Thus, "[w]hile a federal habeas court need not 'formal[ly]' apply both *Brecht* and 'AEDPA/*Chapman*,' AEDPA nevertheless 'sets forth a precondition to the grant of habeas relief.'"  *Id*. (quoting *Fry,* 551 U.S. at 119-120).  *See also Blackston*, 780 F.3d at 359 ("The deferential posture of § 2254(d)(1) is understood to be 'subsume[d]' within *Brecht* review, which is itself deferential.").  In other words, "[w]hen a *Chapman* decision is reviewed under AEDPA, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Ayala*, 135 S.Ct. at 2199 (quoting *Fry*, 551 U.S. at 119) (emphasis in original).  *See also Simmons v. Moore*, 2016 WL 5417827 at * 9 (N.D. Ohio July 22, 2016).

As noted above, "a state court decision is not unreasonable if 'fairminded jurists could disagree' on its correctness.'" *Ayala*, 135 S.Ct. at 2199 (quoting *Richter*, 562 U.S. at 101).  A habeas petitioner, therefore, must show that "the state court's decision to reject his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. (quoting *Richter*, 562 U.S. at 103).

When conducting a harmless-error analysis of Confrontation Clause violations, this Court utilizes the factors outlined by the Supreme Court in *Van Arsdall, supra.  See e.g., Jensen v. Romanowski*, 590 F.3d 373, 379 (6th Cir.2009) ( "[W]e assess the prejudicial impact of constitutional trial errors under the 'substantial and injurious effect' standard set forth in *Brecht*, examining the error by applying the *Van Arsdall* factors to the facts in the case."); *McCarley*, 801 F.3d at 665.  The Supreme Court reasoned in *Van Arsdall* that whether an error is harmless in a particular case "depends upon a host of factors."  *Van Arsdall*, 475 U.S. at 684.  Those factors include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and ... the overall strength of the prosecution's case."  *Id*.

For the following reasons, the Court finds the state appellate court reasonably concluded that prohibiting the defense from cross-examining L.L. regarding her prior false police report constituted harmless error.[3]  In so finding, the Court analyzes the state appellate court's harmless

---

[3] The parties do not challenge the state appellate court's finding that the trial court erred in prohibiting the defense from cross examining L.L. regarding the false police report.  In this regard, the Court notes that, although Jones expressly argued the exclusion of this evidence constituted a Confrontation Clause violation under the Sixth Amendment, the state appellate court did not expressly analyze this issue as a federal constitutional violation.  This Court

error determination under *Brecht* by applying the factors set forth above in *Van Arsdall*.  As set forth below, consideration of the *Van Arsdall* factors leads to the conclusion that prohibiting cross examination regarding L.L.'s prior false police report did not have a substantial and injurious effect or influence in determining the jury's verdict.

At the outset, the Court acknowledges the first two *Van Arsdall* factors (i.e., the importance of the witness' testimony in the prosecution's case and whether the testimony was cumulative) weigh in Jones' favor.  As the state appellate court itself noted, L.L.'s credibility was a "crucial issue" in the case.  *Jones*, 35 N.E.3d at 945.  As L.L. and Jones were the only witnesses to the events that gave rise to Jones' rape and kidnapping convictions, L.L. was clearly a key witness for the prosecution.  Moreover, the excluded evidence (i.e., cross-examination of L.L. regarding her false police report, as well as the false police report and associated documentation) was not cumulative to other evidence at trial; i.e., there was no other evidence introduced at trial indicating L.L. had previously lied to the police.  Thus, the first two *Van Arsdall* factors weigh in Jones' favor.

The remaining three factors, however, weigh heavily in favor of the State.  As noted *supra*, the third *Van Arsdall* factor is "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points."  *Van Arsdall*, 475 U.S. at 684.

---

must nevertheless accord AEDPA deference to the state court's decision.  In *Johnson v. Williams*, 568 U.S. 289, 133 S.Ct. 1088, 1096, 185 L.Ed.2d 105 (2013), the Supreme Court explained that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits" and, therefore, apply AEDPA deference under § 2254(d).  While this presumption is rebuttable "in some limited circumstances," *Johnson*, 133 S.Ct. at 1096, the Court does not find such circumstances present here.  Indeed, neither party herein argues this Court should conduct a *de novo* review of this claim.

Here, the record contains significant evidence corroborating L.L.'s version of events.  Four witnesses testified at trial regarding L.L.'s mental state and physical appearance directly after the July 13, 2012 incident.  Joseph Tolliver stated he had known L.L. for approximately three to four years, and was the father of her youngest child.  (Doc. No. 9-7 at Tr. 1017-1018.)  He testified L.L. was visiting Cleveland with their daughter that weekend in order to attend Tolliver's family reunion.  (*Id*. at Tr. 1021-1023.)  Mr. Tolliver recalled that, at approximately 11:30 p.m. on the evening of July 13, 2012, L.L. called him repeatedly:

> Q:  When you called [L.L.] back, what was her emotional state like?
>
> A:  She was crying and she was distraught.
>
> Q:  Okay.  Were you able to communicate with her in that phone call?
>
> A:  Um, a little bit.  I tried to get some words, some clear words, just to see what was going on.
>
> Q:  Okay. What did [L.L.] tell you?
>
> A:  She said, Joe, I need you to get in touch with Dawon or Lovasia or somebody, I need help.
>
> Q:  Okay.  Did you ask her why she needed help?
>
> A:  Yes, I did.
>
> Q:  What did she tell you?
>
> A:  She said, Joe, I just been raped.

(Doc. No. 9-7 at Tr. 1028-1029.)  Mr. Tolliver testified he asked L.L. specific questions about what happened but she "really couldn't answer them because she was still trying to get herself together."  (*Id*. at Tr. 1029.)  Mr. Tolliver then called his friend Dawon Campbell and asked him to pick up L.L. and take her to the hospital.  (*Id*. at Tr. 1029-1030.)  He advised L.L. that she

28

needed to "get a rape kit done immediately."  (*Id*. at Tr. 1030.)

Dawon Campbell and Lovasia Clemente picked L.L. up from Ebony Terrance's home late in the evening of July 13, 2012 and drove her to the hospital.  Mr. Campbell testified as follows:

> Q:   What did [L.L.] look like when you picked her up from Ebony's house that night?
>
> A:   She looked like crap.
>
> Q:   What do you mean by that?
>
> A:   I mean, like she had been in a fight or something.  I don't know.  She was all roughed-up looking.  She didn't look the same.  She was crying.

(Doc. No. 9-8 at Tr. 1325.)  Mr. Campbell's fiancé, Ms. Clemente, testified similarly:

> Q:   When you arrived at Ebony's house, what did you do?
>
> A:   [Dawon] and I got out of the truck, and I saw [L.L.] sitting on the stairs. And as I got closer to her, I saw she was upset.  It was dark outside.  She was really upset.  I told her to come on and get in the car.
>
> \* \* \*
>
> Q:   When you say [L.L.] looked upset, what do you mean by that?
>
> A:   She was crying, shaking.  She just looked upset, like not herself.
>
> Q:   Could you make any observations about her appearance, from how her clothes looked?
>
> A:   She was just not together at all.  Um, she had on a short-sleeve kind of T-shirt, and she was sitting like she was cold, holding herself on the stairs of Ebony's porch.
>
> Q:   When you motioned for [L.L.] to get into your car, what did [L.L.] do?
>
> A:   She tried to get up.  She looked, like she couldn't on her own.  I went up closer to her, and I helped her off the porch.

* * *

Q:     And how long did it take [L.L.] to get into your truck?

A:     It took awhile.  She just seemed like she just– she wasn't in the best place to walk on her own.  So that's why I was helping her.  It took about a few minutes to get her into the truck.

(Doc. No. 9-8 at Tr. 1338-1339.)  Ms. Clemente also testified [L.L.] was unable to "sit straight down" because she said "her back side area hurted really bad."  (*Id*. at Tr. 1340.)  Instead, L.L. drove to the hospital "tilted over towards the door."  (*Id*. at Tr. 1342.)

L.L. presented to the emergency room ("ER") at Marymount Hospital and was directed to go to Hillcrest Hospital for a sexual assault examination.  There, L.L. was examined by sexual nurse assault examiner ("SANE") Mary Andrykovitch.  (Doc. No. 9-7 at Tr. 1085, 1094.)  Ms. Andrykovitch testified she remembered L.L. because she was "in so much pain."  (*Id*. at Tr. 1097.)  She further recalled "being highly concerned, because [L.L.'s] a diabetic, and her numbers were through the roof."  (*Id*. at Tr. 1097-1098.)  Reviewing the medical records from L.L.'s SANE examination, Ms. Andrykovitch testified L.L. told her she had been sexually assaulted, including that she had been anally raped.[4]  (*Id*. at Tr. 1120-1123.)  Ms. Andrykovitch further testified as follows:

_____

[4] Specifically, Ms. Andrykovitch read to the jury the portion of her examination report in which she recorded what L.L. said had happened to her, in pertinent part as follows: "He [i.e., Jones] then pushed me down, and sat on me, and said he had to get it off.  Now that he was hard, he said, he wanted to grab my ass.  So he grabbed my shorts and flipped me over.  He started rubbing his penis on my shorts, and I was telling him to stop and get off of me.  I was on my right shoulder which has a torn rotator cuff, so I couldn't move or get up.  Then he pulled my shorts down, shoved it in, clarified his penis, into my butt.  I yelled and told him he was hurting me, and he was in my hole.  He, Gregory, kept saying, just wait, I'm almost here.  I'm almost there.  I kept telling him to get off.  I was crying.  He then said, I'm done, and he got off of me.  I just laid there because I couldn't physically move, and I was scared and shocked."  (*Id*. at Tr. 1122.)

30

Q:      Did you document her emotional status when you encountered her?

A:      Yes, she was crying, shaking, and visibly upset.

Q:      Is that consistent with your memory of treating [L.L.]?

A:      Yes.

(*Id.* at Tr. 1117.)

The nature and extent of L.L.'s injuries provides further corroboration of L.L.'s version of events.  Ms. Andrykovitch testified she conducted a thorough examination of L.L. in the early morning hours of July 14, 2012, at approximately 4:00 a.m.  (*Id.* at Tr. 1111.)  She recorded and photographed several injuries to various parts of L.L.'s body, including (1) red marks on the right side of L.L.'s neck consistent with bite marks; (2) bruising on L.L.'s right shoulder; and (3) lacerations on L.L.'s anus.  (*Id.* at Tr. 1117-1118, 1125-1126.)  Ms. Andrykovitch also testified L.L.'s blood sugar levels were at a dangerously high level, to the extent she was at risk of diabetic coma or death.  (*Id.* at Tr. 1102-1103.)

Finally, several witnesses provided testimony corroborating portions of L.L.'s testimony regarding what happened in Jones' bedroom that evening.  L.L. testified, in part, that Jones pulled her pants partially down and forced his penis into her anus.  (Doc. No. 9-5 at Tr. 714.)  She testified she was crying and "begging him to stop and not to do it," and "he proceeded to say, he couldn't help it, he needed to cum, he just needed to cum."  (*Id.* at Tr. 714-715.)  L.L. stated "the more I asked him to stop, the more force" he used, until he finally ejaculated and removed his penis from her anus.  (*Id.* at Tr. 715-717.)  Later, the State called Amesha McCoy.  Ms. McCoy  testified she spoke with Jones shortly after the incident in question.  (Doc. No. 9-10 at Tr. 1727-1728.)  Ms. McCoy testified Jones told her the following about the events of July 13,

31

2012:

> Q:  And what did he tell you she said to him while he was performing anal sex on her?
>
> A:  That it hurted, and stop.
>
> Q:  And did he tell you that he stopped when she told him to?
>
> A:  He said, he told me he kept going because it felt good.
>
> Q:  And then after the fact, how did she leave his house?
>
> A:  She walked and was crying . . . .

(*Id*. at Tr. 1729.)  The State also called Mercedes Carter, who was Jones' girlfriend at the time. Ms. Carter testified Jones denied raping L.L. but told her (Carter) that, while he was having anal sex with L.L. she "was saying stop."  (Doc. No. 9-11 at Tr. 1867.)

In light of the above, the Court finds the third *Van Arsdall* factor (i.e., "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points." ) weighs heavily in favor of the State.

The Court further finds the fourth *Van Arsdall* factor weighs in the State's favor.  That factor is "the extent of cross-examination otherwise permitted."  *Van Arsdall*, 475 U.S. at 684. Here, L.L. was cross-examined at length by defense counsel regarding virtually every aspect of both her story and her relationships with the other witnesses in the case.  Indeed, the transcript of L.L.'s cross-examination spans over two hundred pages.  (Doc. No. 9-6 at Tr. 809-1011.) Among other things, defense counsel cross-examined L.L. regarding her relationship with Mr. Tolliver, including the details of their many custody disputes over their daughter and the fact Mr. Tolliver had called her "manipulative, conniving, and a liar" on Facebook.  (*Id*. at Tr. 834-835.) Defense counsel further attacked her credibility by questioning her regarding alleged remarks

she had made indicating she "liked men in uniform" and was looking for a relationship on the evening in question.  (*Id*. at Tr. 892.)  L.L. was also cross-examined at length regarding several inconsistencies between her trial testimony and statements she made to other witnesses in the case.  (*Id*. at Tr. 927-929, 940-959.)

In addition, defense counsel also had the opportunity to (and did) cross-examine the corroborating witnesses discussed above.  For example, defense counsel engaged in a lengthy cross-examination of Mr. Tolliver on various topics, including his rocky relationship with L.L. and use of the terms "manipulative, conniving, and a liar" to describe her.  Defense counsel also cross-examined Ms. McCoy regarding her extensive criminal record and the timing of when she came forward to offer testimony against Jones, suggesting her testimony was offered in the hopes of obtaining leniency in a pending criminal case.  In light of the above, the Court finds the fourth *Van Arsdall* factor (i.e., the extent of cross-examination otherwise permitted) weighs in favor of the State.

Finally, the Court finds the fifth *Van Arsdall* factor (i.e., the overall strength of the prosecution's case) weighs in the State's favor.  *See Van Arsdall*, 475 U.S. at 684.  As noted above, L.L. testified she did not consent to anal sex with Jones, stating she was crying, struggling to get away from him, and "begging him to stop and not to do it."  (Doc. No. 9-5 at Tr. 714-716.)  The testimony presented by the State established that L.L. reported the assault to Mr. Tolliver and Ebony Terrance almost immediately upon escaping from Jones and returning to Ms. Terrance's home.  She was described by several witnesses as visibly upset, shaking, crying, disheveled, and "all roughed-up."  Numerous witnesses testified L.L. immediately went to two separate hospitals to seek treatment for injuries stemming from the assault, including bruising,

33

bite marks, and lacerations to her rectal area.  SANE nurse Ms. Andrykovitch testified

extensively regarding L.L.'s demeanor, mental state, the nature and scope of her injuries, and her

elevated blood sugar levels.  Ms. Andrykovitch's photographs of L.L.'s injuries were introduced

as evidence and presented to the jury.  The State also introduced evidence L.L. reported the

incident to the police several days later, after receiving advice about how and where to report

assault by a police officer.  While circumstantial, this evidence strongly supported L.L.'s trial

testimony that Jones kidnapped and raped her on the evening of July 13, 2012.

In addition to the above, the State introduced evidence regarding L.L.'s various chronic

health conditions in order to cast doubt on Jones' testimony L.L. consented to anal sex on the

evening in question.  Specifically, L.L. testified she had suffered from type 1 juvenile diabetes

for many years, requiring her to constantly monitor her blood sugar levels.  (Doc. No. 9-4 at Tr.

541-546.)  She indicated she had an insulin pump for the past two and a half years that was

attached to her via catheter and helped control her blood sugar levels.  (*Id*. at Tr. 542-543.)  L.L.

indicated the pump was powered by AAA batteries.  (*Id.*)  She stated that, if the batteries died,

she could inject herself with insulin but would have to do so every hour or so.  (*Id*. at Tr. 544-

545, 584-585.)  L.L. testified the consequences of failing to regulate her blood sugar were

severe, including dizziness, passing out, diabetic coma, or possible death.  (*Id*. at Tr. 545-547.)

Mr. Tolliver also testified regarding L.L.'s diabetes, stating she wore her insulin pump every day

and he had never seen her without the pump for longer than an hour at a time.  (Doc. No. 9-7 at

Tr. 1021.)

L.L. further testified that, in July 2012, she suffered from "frozen shoulder," which

caused weakness and limited range of motion in her right shoulder.  (Doc. No. 9-4 at Tr. 550-

34

551.)  L.L.'s orthopedic surgeon, Joseph Thometz, testified at trial and confirmed L.L. suffered

from adhesive capsulitis of her right shoulder in July 2012.  (Doc. No. 9-5 at Tr. 629.)  Dr.

Thometz testified adhesive capsulitis is "a condition where the shoulder gets very stiff, painful,

and the joint, if you will, gets frozen.  It won't move because the lining around the joint has

shrunk so it is tight, and the shoulder can't be taken through its normal motion."  (*Id*. at Tr. 630-

631.)  He indicated this condition causes pain, weakness, and limited range of motion.  (*Id*.)  Dr.

Thometz stated he examined L.L. in May 2012 and found she had "significant restriction for

range of motion for her [right] shoulder."  (*Id*. at Tr. 633-635.)  He testified he scheduled L.L.

for surgery and, on August 14, 2012, she underwent a right shoulder manipulation with

arthroscopic debridement.  (*Id*. at Tr. 637.)

Finally, L.L. testified her diabetes caused nerve damage in her mouth, resulting in

extensive dental work in the months leading up to the July 13, 2012 incident.  (Doc. No. 9-4 at

Tr. 552-555.)  She stated that, on that date, she recently had multiple teeth removed and was

experiencing pain and bleeding in her gums.  (*Id*.)  L.L.'s dentist, Willie Rucker, testified at trial

that he removed multiple teeth from L.L.'s upper and lower jaws in the months preceding the

July 2012 incident.  (Doc. No. 9-5 at Tr. 665-673.)  In particular, Dr. Rucker noted that, on June

27, 2012, he removed five of L.L.'s teeth, including three teeth from her lower front jaw.  (*Id*. at

Tr. 671-672.)  He testified that, because of L.L.'s diabetes, the healing time for this type of

procedure would have been six weeks or longer.  (*Id*. at Tr. 670.)  Dr. Rucker further indicated

he was attempting to fit L.L. with dentures at the time, which required him to "reduce the gums"

on her top and lower jaws.  (*Id*. at Tr. 670-676.)  He stated this caused "bony spicules," which he

described as small pieces of sharp, broken off bone "that would be sticking up out of the gum."

(*Id*. at Tr. 675-676.)  Dr. Rucker testified further as follows:

> Q:     Okay. Now, from the time when you first began this process on May 17th of
>         2012, to when you finished making adjustments to her dentures, then had to
>         start over because of gum damage, I believe that was September of 2012,
>         what would have been the condition of [L.L.'s] gums during that entire
>         process?
>
> * * *
>
> A:     Well, the lower front area even five – almost four months, that lower front
>         area, still had not healed.  The lower front area.  The back areas on the
>         bottom had.  But, that was – it had not healed completely.  She was still
>         having some discomfort.
>
> Q:     And while she was going through this healing process, would that front area
>         of her gums, would that have caused her pain?
>
> A:     Um, possible, because, the bony chips that were actually coming up through
>         there, she wasn't able to wear dentures.  That was an indication she said she
>         was having pain, because she couldn't wear it.
>
> Q:     That's because the pressure of those dentures on that healing gum tissue
>         would have caused her pain?
>
> A:     Yes, it would have.
>
> Q:     Would putting any type of pressure on that gum, while it was healing, would
>         that have caused her pain?
>
> A:     Yes, could have, yes.

(*Id*. at Tr. 678-680.)  L.L. testified that, on July 13, 2012, her mouth was still "very sore" and

bleeding.  (Doc. No. 9-4 at Tr. 572-573.)  She also stated that she was unable to eat anything that

day because "once I bit down, my mouth started bleeding . . . It was too painful."  (*Id*. at Tr.

577.)  L.L. indicated that, just before Jones arrived at Ms. Terrance's house, she told Ms.

Terrance she could only wear her top dentures because "my bottom [gums] was still bleeding."

(*Id*. at Tr. 600.)  Mr. Tolliver confirmed that, in the afternoon of July 13, 2012, L.L.'s mouth

hurt, she was having problems eating, and she had to take her dentures out.  (Doc. No. 9-7 at Tr. 1026.)

The testimony and evidence regarding L.L.'s health conditions was significant for several reasons.  First, the State used this evidence to argue to the jury that L.L. would not have gone to Jones' house to engage in sexual activity of the kind described given the fact (1) she did not have her insulin pump or syringe with her; (2) she had injected herself approximately forty five minutes prior to arriving at Jones' house and could not go longer than a total of approximately one hour to one hour and fifteen minutes without another injection; and (3) she was aware of the potentially life threatening consequences of failing to regulate her blood sugar due to her lifetime struggle with type 1 diabetes.  In this regard, the State elicited evidence (both from L.L. and from SANE nurse Andrykovitch) that, when L.L. arrived at Hillcrest in the early morning hours of July 14, 2012, her blood sugar levels were "dangerously high."  (Doc. No. 9-5 at Tr. 738-739, 746-747; Doc. No. 9-7 at Tr. 1097-1098, 1102-1103.)  The State also argued L.L. would not have sought to engage in anal sex with Jones that night given the pain she was experiencing, particularly the pain in her right shoulder.

Second, the State used the above evidence regarding L.L.'s chronic medical conditions to cast doubt on various aspects of Jones' testimony.  Jones testified in his own defense, insisting that all sexual activity between L.L. and himself was consensual.  (Doc. No. 9-11 at Tr. 1911-2020.)  Among other things, Jones testified that, when he and L.L. were sitting on the couch in his bedroom, she repeatedly "kissed" his penis.  (Doc. No. 9-11 at Tr. 1922.)  The State cross-examined Jones regarding this testimony, attempting to establish it was not credible given the fact L.L. had recently had five teeth removed and her gums were sore and bleeding on the night

in question, to the extent she was unable to eat or wear her dentures.  (*Id*. at Tr. 1968-1969.)

Jones also testified that, once he and L.L. were on his bed, she helped get her pants off, "tilted

up" her butt, got on her knees, reached between her legs, and placed his penis near her anus.  (*Id*.

at Tr. 1924-1926, 1982-1986.)  The State extensively cross-examined Jones regarding the

credibility of this testimony, attempting to establish it was impossible in light of L.L.'s right

shoulder injury and Dr. Thometz' testimony regarding her right shoulder pain, weakness, and

limited range of motion.  (*Id*. at Tr. 1982-1987.)

Finally, the State introduced evidence that, shortly after the incident, Jones spoke with

Antawn Owens about the events of July 13, 2012.  Mr. Owens testified Jones stated "it was

consensual" and was shocked and wondered "how can she [i.e., L.L.] do this?"  (Doc. No. 9-9 at

Tr. 1419.)  Mr. Owens then said "I think she just wants money" and Jones stated "well, if she

wanted money, I would have gave her money.  Like, is there any way we can get rid of this?"

(*Id*.)  Mr. Owens stated Jones asked him to get in touch with L.L. to determine if she wanted

money.  (*Id*. at Tr. 1428-1429.)  L.L. testified she received a phone call from Mr. Owens, which

she played on the speaker phone in the presence of several of Mr. Tolliver's family members.

(Doc. No. 9-5 at Tr. 768-778.)  L.L. testified Mr. Owens told her Jones "wanted to make a deal."

(*Id*. at Tr. 770.)  She stated Mr. Owens indicated Jones would pay her up to $30,000 if she

dropped the charges.  (*Id*. at 772-773.)  L.L. did not accept Mr. Owens' offer and immediately

reported the conversation to the police.  (*Id*. at Tr. 772-773, 778.)

In light of the above, the Court finds the fifth *Van Arsdall* factor (i.e.., the overall

strength of the prosecution's case) weighs in favor of Respondent.  Considering the above

evidence as a whole, the State presented a strong case against Jones.  As the state appellate court

noted, L.L. immediately reported the rape to Mr. Tolliver, Mr. Campbell, Ms. Clemente, and SANE nurse Ms. Andrykovitch.  All of these witnesses testified that she was visibly upset, crying, shaking, and disheveled.  L.L. immediately proceeded to the hospital for a sexual assault examination, which documented injuries consistent with her description of the events.  The State presented evidence Jones admitted afterwards (to Ms. McCoy) that L.L. had told him to stop while they were having anal sex, but he did not stop "because it felt good."  (Doc. No. 9-10 at Tr. 1729.)  Evidence regarding L.L.'s chronic health conditions also cast significant doubt on certain aspects of Jones' story.  Finally, the State presented evidence that Jones asked Mr. Owens to contact L.L. to determine whether she would accept money in exchange for dropping the charges.

Jones argues the fifth *Van Arsdall* factor weighs in his favor.  He asserts the State's case was, in fact, extremely weak, as evidenced by the fact he was acquitted of the three gross sexual imposition ("GSI") charges relating to the July 13, 2012 incident with L.L.  The Court finds this argument without merit.  The charges at issue in this federal habeas action are Jones' convictions and sentences for kidnapping and rape.  With respect to those charges, the State presented significant evidence that Jones initiated anal sex, at which point L.L. started crying and begging him to stop.  The State also presented evidence L.L. tried to get out from underneath Jones but was unable to do so because of her shoulder condition.  Numerous witnesses testified to L.L.'s demeanor and injuries immediately after the assault.  Moreover, the State introduced evidence Jones told Ms. McCoy that, while they were having anal sex, L.L. started crying and told him to stop but he did not do so.  Although the jury rejected the testimony and evidence regarding the events leading up to L.L.'s kidnapping and rape that formed the basis of the GSI charges, the

jury clearly found the anal sex that occurred that night was not consensual.  As set forth above, the overall strength of the State's case with respect to the kidnapping and rape charges was strong.

Accordingly, and for all the reasons set forth above, the Court finds the state appellate court's harmless error determination was not unreasonable; i.e., it was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ayala*, 135 S.Ct. at 2199 (quoting *Richter*, 562 U.S. at 103).  The Court further finds that, while the exclusion of evidence and testimony regarding L.L.'s prior false police report might have had some effect on the jury's deliberations, it did not have a "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht, supra*, in light of the wealth of evidence introduced against Jones at trial.

Accordingly, and for all the reasons set forth above, the Court finds Jones' first ground for relief without merit.

### 2.    Ground Two

In his second ground for relief, Jones argues the trial court deprived him of his Fourteenth Amendment right to Due Process by allowing the State to examine him about whether he disclosed to L.L. that he had a sexually transmitted disease.  (Doc. No. 2 at 16.)

On direct appeal, the state appellate court found the trial court had, indeed, erred in allowing the State to question Jones regarding this issue, finding as follows:

{¶ 48} In his second assignment of error, Jones contends that the trial court erred when it allowed the state to question him about having genital herpes, a sexually transmitted disease ("STD").  Jones argues that the evidence regarding herpes was irrelevant and unduly prejudicial and therefore inadmissible. [footnote omitted]

{¶ 49} In response, the state claims that, depending on Jones's answer, the evidence

would go toward the lack of consent or Jones's credibility:

> First, if [Jones] answered, "Yes," when asked if he told L.L. he had herpes before having sex with her, in order to find [Jones's] testimony truthful, the jury would have been required to believe that after meeting [Jones] and having known him for a very brief period of time, and despite her myriad medical issues and the fact she was on her period, L.L. agreed to have unprotected anal sex with a herpes-infected [Jones] at the risk of death due to her diabetes;

> Second, if [Jones] answered, "No," * * * the jury would have been in a better position to evaluate both [Jones's] credibility and the reasonability of his testimony, in light of the fact he admittedly withheld the fact he had an STD from L.L. who he claimed then had consensual, unprotected anal sex with him at risk of death due to her diabetes.

{¶ 50} At the close of the state's evidence, defense counsel moved to have the state precluded from questioning Jones, should he testify, about whether he disclosed to L.L. the fact that he has herpes. The trial court denied Jones's motion, stating that the evidence would go toward consent and is probative of truthfulness.

{¶ 51} After the court's ruling, Jones took the stand in his own defense. Upon cross-examination, and over defense counsel's objections, the following exchange took place:

> State: So your testimony is that she first grabbed your penis, put it right there on her anus, you took that as a sign to go ahead and push your penis in. So without asking for any lubrication, she initiated that anal sex, correct?

> Jones: Correct.

> State: Okay. At what point during that part of the activity did you tell [L.L.] that you have herpes?

> Jones: At no point.

> State: Okay. Why didn't you tell her that fact? Isn't that something she should have known before she agreed to have unprotected, anal sex with you, who [m] she had known for 35 or 40 minutes?

> Jones: When I have a lesion, I make sure, I'm protected with—when I

41

have a lesion. I had no lesion at that time.

State: So, you decided you didn't need to tell [L.L.] that you had herpes before you had unprotected, anal sex with her. Is that correct?

Jones: Correct.

\* \* \*

State: At what point in this evening in the 40 minutes you had known [L.L.] did you decide to be a gentleman?

Jones: Well, everything we did that night was consensual.

State: It would have been a gentlemanly thing to do to tell her you had herpes, wouldn't it have been?

Jones: Correct.

{¶ 52} And then in closing arguments, the prosecutor stated:

I would ask you to think about, when you consider this defendant's interest, in your verdicts, if he's willing to lie to you about the little things, then why wouldn't he be willing to lie to you about the big things?

Is he an honest person who you can trust? Because aside from that little lie [about when and where he went to high school], \* \* \* he also told you as part of his testimony, that when this supposed consensual encounter happened with [L.L.], he never bothered to tell her that he had an STD. So, is that an honest person?  Is that somebody you can trust?

{¶ 53} We find the state's claim that evidence of Jones's disclosure, or lack thereof, goes toward the lack of consent or Jones's credibility is without merit.  As evident from the record indicated above, the state's line of questioning was clearly used to demonstrate Jones's bad character, i.e., having sexual relations without disclosing his STD.

{¶ 54} "Character" generally refers to a person's disposition or a general trait, such as honesty, and is described as one's "propensity."  *State v. Smith*, 84 Ohio App.3d 647, 660, 617 N.E.2d 1160 (2d Dist.1992).  As previously discussed, evidence of a person's character or trait is generally not admissible for the purpose of proving that the individual "acted in conformity therewith on a particular occasion," unless the state is presenting character evidence to rebut evidence initially offered by the

42

defendant. Evid. R. 404(A); *State v. Kerr*, 8th Dist. Cuyahoga No. 80272, 2002-Ohio-4190, 2002 WL 1879332, ¶ 22, 24. Evid.R. 404 therefore prohibits an "inferential pattern," in which a character or trait is used to show one's propensity, which is used to show the conforming conduct. *Smith*.

{¶ 55} Here, the prosecutor's suggestion to Jones, guised in the form of a question, that disclosing he had herpes would have been a "gentlemanly thing to do," undoubtedly demonstrated the state's true intention with respect to this evidence: that, at best, Jones was not a gentleman because he did not disclose his STD; and at worst, because he was not a gentleman, the jury can infer that he committed the crimes.  The prosecutor's closing remarks, questioning Jones's honesty and trustworthiness, reinforces the state's position.  When the state's purpose in offering such evidence is the inference prohibited by Evid.R. 404, the evidence is inadmissible. *See Smith* at 663, 617 N.E.2d 1160.  Therefore, evidence that Jones did not disclose that he has herpes was improperly admitted at trial.

{¶ 56} An exception to the impropriety of the admission of character evidence is found in Evid .R. 608(B), which, as previously discussed, permits cross-examination of a witness regarding specific instances of conduct that are "clearly probative of truthfulness or untruthfulness."  Here, however, the fact that Jones did not disclose that he has herpes has no bearing upon his truthful character where he had no obligation to disclose that fact.  Moreover, there is no evidence in the record that L.L. has the disease, that L.L. claims that Jones infected her with the disease, or that L.L. knew Jones had an STD.  The evidence of Jones's failure to disclose having herpes, therefore, is not probative of his credibility.  Rather, Jones's admission that he did not disclose to L.L. that he has herpes leaves the factfinder with the inescapable  conclusion that he is a bad man for NOT disclosing his STD.  Its admission was therefore improper.

*Jones*, 35 N.E.3d at 945-948.  The state appellate court then determined this error (along with the

trial court's improper exclusion of evidence regarding L.L.'s prior false police report) was

harmless, finding:

{¶ 60} Notwithstanding the errors in this case, we find there is overwhelming evidence of Jones's guilt. L.L. testified that she did not consent to anal sex with Jones, stating that she begged him to stop. She reported the incident to her daughter's father and to her friend with whom she was staying almost immediately upon getting away from Jones. Several witnesses testified that she appeared visibly shaken, was crying and in pain, and she was physically disheveled. Having presented herself to two hospitals for examination, she was ultimately referred to a qualified SANE nurse. The SANE nurse testified that L.L. was in a lot of pain, her mouth was swollen, and her blood sugar level was at a potentially fatal level.

43

The nurse also testified that L.L. had red marks on her neck that were consistent with bite marks, bruising on her right shoulder that was consistent with "being held down," and trauma to her rectal area. Dr. Thometz testified that due to L.L.'s adhesive capsulitis, she experienced pain, weakness, and very limited range of motion of her right shoulder and she would not have been able to position herself in the manner to which Jones testified. Within days, L.L. reported to the police that she had been raped.

{¶ 61} In light of the overwhelming evidence above, we cannot say the trial court's errors improperly contributed to Jones's conviction. We therefore find the errors were harmless beyond a reasonable doubt and they did not deprive Jones of a fair trial.

*Id.* at 948.

Jones argues "the evidentiary error in permitting the State of Ohio to introduce evidence about Mr. Jones' STD and his failure to disclose his STD to L.L. was so egregious that it resulted in a denial of Mr. Jones' right to due process of law."  (Doc. No. 2 at 18.)  He asserts that "had the jury not heard evidence that Mr. Jones engaged in unprotected anal sex while concealing the fact that he had a STD, the jury may have acquitted him of all charges."  (*Id.*)  Jones emphasizes "the nature of the improperly admitted character evidence about Mr. Jones was highly inflammatory, and the implication of Mr. Jones' bad character suggested by the State of Ohio was a constitutional violation that shocks the conscience."  (Doc. No. 11 at 2.)

Respondent argues this ground for relief is not cognizable on federal habeas review because it "raises an evidentiary question that is not so egregious as to deny Jones fundamental fairness."  (Doc. No. 9 at 10.)  Respondent further argues the state appellate court's determination the admission of this evidence was harmless was not unreasonable.  (*Id.* at 11.)  In this regard, Respondent maintains Jones' argument the jury would have acquitted him in the absence of this evidence "is overreaching and not well founded because it omits consideration of the strong evidence in this case."  (*Id.* at 12.)

44

As a general rule, an error of state law in the admissibility of evidence does not constitute an infringement of a right guaranteed under the United States Constitution, and is not cognizable in habeas corpus. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Byrd v. Collins*, 209 F.3d 486, 528 (6th Cir.2000). However, the Sixth Circuit has explained that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512. *See also Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2000); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). The Sixth Circuit has cautioned that "courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Bugh*, 329 F.3d at 512 (citations omitted). *See also Dowling v. United States*, 493 U.S. 342, 352-53, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990); *Burger v. Woods*, 2013 WL 613382 at * 2 (6th Cir. Feb. 20, 2013) ("A due process claim premised on a mistaken state court evidentiary ruling faces a steep climb."). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour,* 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996)). Moreover, in order to obtain habeas relief in this context, a petitioner must establish "actual prejudice" from the admission of the allegedly improper evidence. *Clemmons v. Sowders*, 34 F.3d 352, 357-58 (6th Cir. 1994). *See also Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000) (petitioner must show that admission of improper evidence is "material in the sense of a crucial, critical highly significant factor"); *Burger*, 2013 WL 613382 at * 3 (same).

In light of the above, and to the extent Jones's challenge in Ground Two is based on state

45

law evidentiary rules, his claim is not cognizable under federal habeas review.  Thus, the Court
will not reach Jones' arguments insofar as they allege the state appellate court decision violated
Ohio's Rules of Evidence.

Jones does argue, however, that the state courts violated his federal constitutional rights,
in two respects.  First, Jones argues his federal due process rights were violated because allowing
the State to elicit testimony that Jones had an STD (and, further, that he failed to advise L.L. he
had an STD), was so egregious that it resulted in a denial of fundamental fairness.  The Court
disagrees.  While it may have been error to allow this line of questioning, the Court cannot say
the testimony elicited regarding Jones' STD was so inflammatory that it deprived him of
"fundamental fairness," as that term has been narrowly defined by the United States Supreme
Court.  Indeed, Jones does not direct this Court's attention to any U.S. Supreme Court authority
directly supporting his argument that the admission of this evidence rises to the level of a due
process violation.

Jones has also failed to demonstrate he was "actually prejudiced" by the admission of this
evidence; i.e., that the admission of testimony regarding Jones' STD was "material in the sense
of a crucial, critical highly significant factor." *Brown*, 227 F.3d at 645.  As discussed at length
above, the State presented a strong case against Jones.  L.L. immediately reported the rape to
numerous individuals (i.e., Mr. Tolliver, Mr. Campbell, Ms. Clemente, and SANE nurse Ms.
Andrykovitch), all of whom testified she was visibly upset, crying, shaking, and disheveled.
L.L. then immediately proceeded to the hospital for a sexual assault examination, which
documented injuries consistent with her description of the events.  She also reported the rape to
the police within days of the incident.  Moreover, the State presented evidence Jones later

46

admitted to Ms. McCoy that L.L. had told him to stop while they were having anal sex, but he did not stop "because it felt good."  (Doc. No. 9-10 at Tr. 1729.)  Evidence regarding L.L.'s chronic health conditions also cast significant doubt on certain aspects of Jones' story.  Finally, the State presented evidence that Jones asked Mr. Owens to contact L.L. to determine whether she would accept money in exchange for dropping the charges.  In light of the above, the Court finds that, while error, the admission of testimony regarding Jones' STD was not so egregious so as to deny him fundamental fairness.

Jones also appears to argue the state appellate court's harmless error determination violated his federal constitutional rights with respect to this testimony.  The Court rejects this argument and finds the state appellate court's harmless error determination was not unreasonable; i.e., it was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Ayala*, 135 S.Ct. at 2199 (quoting *Richter*, 562 U.S. at 103).  The Court further finds that, while the trial court's decision to allow the State to elicit testimony about Jones' STD might have had some effect on the jury's deliberations, it did not have a "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht, supra*, in light of the wealth of evidence introduced against him at trial.

Accordingly, and for all the reasons set forth above, Jones' second ground for relief is without merit.

## V. Conclusion

For all the reasons set forth above, it is recommended the Petition be DENIED.


Date:   June 20, 2018                                          *s/Jonathan D. Greenberg*
                                                              Jonathan D. Greenberg
                                                              United States Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**